FRED MARTELL, PLAINTIFF-RESPONDENT, v. RIDGEWAY LANE, CHIEF OF POLICE OF POINT PLEASANT BEACH, *ET AL.*, DEFENDANTS, AND THE STATE OF NEW JERSEY, INTERVENOR DEFENDANT-APPELLANT.

Argued May 28, 1956—Decided June 25, 1956.

Mr. *David M. Satz, Jr.,* Deputy Attorney-General, argued the cause for the State (*Mr. Grover C. Richman, Jr.,* Attorney-General, on the brief).

Mr. *Walter D. Van Riper* submitted a brief as *amicus curiae.*

There was no appearance by the respondent.

The opinion of the court was delivered by

Heher, J. On July 24, 1954 the plaintiff Martell was arrested under a warrant issued out of the local tribunal of Point Pleasant Beach, Ocean County, New Jersey, on a complaint under *N. J. S.* 2*A*:85–14 charging that he aided and abetted another's violation of *N. J. S.* 2*A*:112–1, in playing for money or other valuable thing by means of a "device having one or more figures or numbers thereon." The action followed representations made to him by the mayor that the operation transgressed a municipal ordinance prohibiting the use of machines in the nature of gambling devices.

Thereupon, plaintiff invoked the jurisdiction of the Chancery Division of the Superior Court by a verified complaint directed to the chief of police and other officers of the municipality, alleging that he was the owner and operator upon premises in Point Pleasant Beach of "various games and businesses," and had installed and managed there a "Stop and Go Game," found to be a "legal" device by the judgment of the Chancery Division of the Superior Court rendered February 6, 1953 in the unreported case of *Harris v. Hock;* that the "operation of the 'Stop and Go' machine by the plaintiff is an important item of the business conducted" by him, and the game is one of "skill and not of chance and is not a violation of *N. J. S.* 2*A*:112–1"; that the "business season for the operation of plaintiff's property at Point Pleasant Beach is short-lived," and he "will sustain and suffer irreparable damage in the loss of the business during the balance of the season"; and praying for judgment declaring that the "Stop and Go Game" is "one of skill and not of chance" and is not within the purview of the ordinance, and restraining interference with its use in the prosecution of plaintiff's business.

There was a temporary restraint to that end; and thereupon, by leave of court, the State intervened as a party defendant and answered challenging plaintiff's allegation that the particular game was one of skill and so not violative of *N. J. S.* 2*A*:112–1. The State's interest is grounded in

the general use of such devices throughout the State and the "doubt and concern as to their legality among prosecutors, other law enforcement officers, and the Legalized Games of Chance Control Commission."

The original defendants did not enter an appearance in the action; and there was judgment by default as to them. After testimony taken at a hearing on the merits, there was a final judgment "in favor of the State and against plaintiff," including the annulment of the temporary restraint. The judgment recites a finding that the "game of 'Stop and Go' as conducted by the plaintiff herein is not a game in which skill, as distinguished from chance, determines the result," but the "basic game of 'Stop and Go,' as was at issue in the case of *Harris v. Hock,*" cited *supra,* "is a game in which skill predominates over chance and is distinguished from the facts in the present case in determining the result," and so the judgment also provided, and to this extent it is in favor of plaintiff, that "(4) The basic game of 'Stop and Go' at issue herein, as described in the complaint, and determined in the case of *Harris v. Hock* * * * is one in which skill and not chance predominates in determining the result of the game."

The State appealed to the Appellate Division of the Superior Court from section (4) of the judgment, as a party aggrieved by the declaration that " 'Stop and Go' was legal if played in a manner similar to the 'Stop and Go' operation at issue in *Harris v. Hock,*" as a game of skill rather than chance.

The appeal is here by certification on our own motion.

Mr. Walter D. Van Riper, by leave of this court, presented a brief as *amicus curiae,* acting for "approximately 40 concessionaires engaged in operating amusements with basic, but not operational similarity, in five New Jersey seashore municipalities."

Insisting that the issues litigated below were "whether the game is (1) in violation of the borough ordinance, or (2) in violation of *N. J. S.* 2A:112–1, *et seq.,*" and that it

was found below that the game "as operated by the plaintiff was in violation of both the ordinance and the statute," it is urged that the State, "having thus prevailed in its contention," is not aggrieved by the judgment "insofar as it pertains to the issues in this case" and "could not appeal therefrom, and the plaintiff not having done so," this court "cannot now properly be asked to adjudicate these questions which have now become moot."

But it is conceded that section (4) has no place in the judgment and, under *Scott v. Stewart,* 2 *N. J.* 508 (1949), should be exscinded as involving the nature of the mechanical operation under other and different circumstances not before this court and beyond the issues raised below.

▮ Thus, the State is aggrieved by the inclusion in the judgment of a provision sanctioning the "basic game" of "Stop and Go" as one in which "skill and not chance predominates in determining the result of the game," an issue not litigated below, and without regard to whether, on the converse hypothesis, the operation would contravene *N. J. S.* 2*A*:112–1 and constitute also a violation of *N. J. S.* 2*A*:112–3. Of this, more hereafter. It sufficies now to say that the State has raised appealable issues.

The provision of the judgment under review seems to proceed upon the assumption that the game of "Stop and Go" may be played "under certain conditions" not contrary to law. But the State contends that the judgment in effect is that the "basic game" of "Stop and Go" is one of skill and not chance, and therefore according to law, and that such was the operation in *Harris v. Hock,* yet the game as played in that case "did not differ materially from 'Stop and Go' " as played in the case at hand. It is said that the "mechanical and electrical operations were identical except that the sequence of numbers and physical characteristics of the number board differed," a difference not material to this inquiry, and thus the holding is adverse to the State's interest in the enforcement of the laws against gaming.

"Stop and Go" is described by the State as a "game at which persons, by staking money, seek to win packages of

cigarettes, the number of which depend on certain results of the outcome of a particular game."

The component parts of the game are electronically or mechanically interrelated. The first basic element is an upright, stationary board, circular in shape, called the "number board," divided into 54 sections. There is a separate light bulb in each section, at the outer edge of the board. The sections are designated by a series of numbers, *e. g.* 0–0–0–0, 8–3–3, or by symbols representing a spade, heart, diamond or club. The digits range from 0 to 11, and their frequency of appearance in any of the 54 spaces varies, it is said. For example, number 11 appears 13 times in 7 different spaces or slots on the circular board. The digit 0 appears 16 times in 9 different spaces. The symbols of card suits appear in but one space, arranged at four opposite points in the circle. At the top of the circular board are two larger light bulbs, one colored red, designated as the "stop" light, and the other green, designated as the "go" light. The green bulb, when it lights up, controls the commencement of the game, while the lighting up of the red bulb determines one of the conditions of play. The encased motor spins at 1,725 revolutions per minute and is geared down to normal operating speed at 86 revolutions per minute; there is a wire connection with the buttons, and the mechanical operation is thereby electrically controlled. There are other elements which need not be set out here.

The participating players place a ten-cent piece on the counter at the space having the chosen number. The object is to control the mechanism by means of the "stop" button, to the end that at the close of the game a bulb will be lit in a space containing the selected number. Players are not limited in the number of dimes placed on a square; and they are permitted to put several dimes on different numbers, a practice having advantages for the player. More than one player may place coins on the same square. One player may, by pushing the "stop" button, cut off the electric current at the spot which he deems most advantageous, and then all control of the rotating arm is lost except as to one

"competitor"; and so, it is insisted, the element of chance predominates. It was found that in the operation at Point Pleasant Beach, the circular number board had a repetition of numbers which made playing success possible by the lighting of a space having a number corresponding to the one upon which the player placed his money, but at a point on the circular board other than the point at which the player had originally aimed; and this was deemed success depending on chance, which as to this method of play seemed to be conceded by plaintiff's experts. The judgment also embodies findings that in the particular operation, the "player or players who have chosen any one of the numbers marked in the slot then receive a prize consisting of a certain number of packages of cigarettes," and in this game "a person tries to aim for a particular slot on the board but not more than one slot," and "there are several slots on which a person may have the number he has chosen and therefore be paid off," and so the game, as played here, is not of skill as distinguished from chance.

There is no need of further elaboration on the mechanical process to determine whether under any and all circumstances the use of this mechanism involves a predominance of chance over skill. It suffices to say that in the Point Pleasant Beach operation, the player risks the dime against the operator of the instrument; on the outcome will depend whether the player-customer is the winner of cigarettes from the operator, or the operator the winner of the player's dime. The operator may be called upon to deliver cigarettes to all players selecting a winning number, yet he may win all the money placed on the counter if success does not come to any of the players. And, quite apart from the mechanical obstacles favorable to the operator, we are told that the operator may reset the timing device and thus affect the outcome. Players winning more than four times are barred from further play; and the operator sets the odds on payoffs. This is not the case of a drawing for prizes as rewards for skill in which there is no staking of money or thing of value by the participants, but rather the "playing for money

or other valuable thing * * * with" an "instru-
ment, engine, apparatus or device having one or more figures
or numbers thereon," denounced as a misdemeanor by *N. J. S.*
*2A*:112–1.

And it does not matter that skill predominates in the
process. The operation here is within the spirit and the
indubitable reason of the statute. "Stop and Go" involves
a mechanism having lights, figures and numbers on the
playing board, a motor, contact plates and a revolving arm,
put into action through button control by players who seek
to win more than they have wagered.

The sense of the statute is to be gathered from the whole
of the expression. It is provided that:

> "Any person playing for money or other valuable thing at cards,
> dice or other game, with one or more dice, or with any other
> instrument, engine or device in the nature of dice, having one or
> more figures or numbers, or at billiards, pool, tennis, bowls or
> shuffleboard, or A.B.C. or E.O. table, or other tables, or at faro
> bank, or other bank of a like nature by whatever name known, or
> with any slot machine or device in the nature of a slot machine,
> or with any other instrument, engine, apparatus or device having
> one or more figures or numbers thereon, is guilty of a misdemeanor."

The reason of the act is revealed by the specific enu-
meration within the playing ban of billiards, pool, tennis,
shuffleboard and bowls, games in which by general consent
skill is the predominant element. The meaning of words
may be indicated or controlled by those with which they
are associated. *State v. Murzda,* 116 *N. J. L.* 219 (*E. & A.*
1936).

And, by the selfsame reasoning, the keeper of a place
to which persons may resort for such proscribed practices
would contravene *N. J. S.* *2A*:112–3, rendering criminal the
keeping of a place to which resort may be had "for gambling
in any form." Whatever the *modus operandi,* the instru-
ment here was used as a means of wagering in disregard of
*N. J. S.* *2A*:112–1, and it is the keeping of a place for this
purpose that the particular provision condemns. See *State
ex rel. Dussault v. Kilburn,* 111 *Mont.* 400, 109 *P. 2d* 1113,
135 *A. L. R.* 99 (*Sup. Ct.* 1941). The principle was ex-

pounded in the English case of *Peers v. Caldwell,* 85 *L. J. K. B. n. s.* 754 (*K. B.* 1915), holding under somewhat similar circumstances that the transaction was in substance a "wager"; "The fact that there is a possibility of exhibiting some degree of skill does not * * * alter the liability of the appellants"; it is easy to understand that "a game may be one of skill whilst the player only thinks of it as a matter of chance"; "* * * the boys were not exercising skill; they were regarding only the sweets * * *." And Avory, J. said that "* * * the boys were not paying their halfpennies for the privilege of competing at a game of skill, but were simply gambling on the chance of getting twopenny-worth of sweets." See *MacArthur v. Wyscaver,* 120 *Colo.* 525, 211 *P. 2d* 556 (*Sup. Ct.* 1949). "To gamble" is "To stake money or any other thing of value upon an uncertain event; to hazard; wager": and "Gambling" is "the act of playing or gaming for stakes." *Webster's New International Dictionary.* And see *City of Moberly v. Deskin,* 169 *Mo. App.* 672, 155 *S. W.* 842 (*App. Ct.* 1913).

The 1947 *Constitution, Article* IV, *Section* VII, *paragraph* 2, precludes legislative sanction for "gambling of any kind," unless authorized by the electorate at a general referendum. See *Lucky Calendar Co. v. Cohen,* 19 *N. J.* 399 (1955).

▉ There is no need now to consider the judgment in *Harris v. Hock.* It is enough to say that we have no occasion in the present context to decide whether the "basic game" of "Stop and Go" is one in which "skill and not chance predominates in determining the result of the game." Whether the game itself be one of skill or chance, wagering on the outcome is within the condemnation of *N. J. S.* 2A:112–1. Section 4 of the judgment is accordingly expunged.

The judgment is modified in conformity with the foregoing considerations and, as so modified, affirmed.

*For modification*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, JACOBS and BRENNAN—6.

*Opposed*—None.